IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| KIP SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 6:12-3322-DGK-SSA |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER REMANDING CASE TO COMMISSIONER

Plaintiff Kip Sanders ("Sanders") seeks judicial review of the Commissioner of Social Security's denial of his applications for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, *et. seq.*, and supplemental security income ("SSI") based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et. seq*. The Administrative Law Judge ("ALJ") found that Sanders suffers from a variety of severe impairments, including left thumb tenosynovitis[2] with loss of feeling, but retained the residual functional capacity ("RFC") to use his left thumb in a limited fashion. After hearing testimony from a vocational expert ("VE"), the ALJ found Sanders could perform sedentary unskilled jobs, such as a final assembler, patcher, and table worker.

Although the ALJ did not err in weighing Dr. Zolkowski's opinion or analyzing Plaintiff's credibility, this case must be remanded to the Commissioner for clarification because it is unclear from the existing record whether substantial evidence supports the ALJ's determination.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Michael J. Astrue as the defendant in this suit.

[2] Tenosynovitis is inflammation of a tendon and its enveloping sheath. PDR Medical Dictionary 1771 (1st ed. 1995).

**Factual and Procedural Background**

The medical record is summarized in the parties' briefs and is repeated here only to the extent necessary.

Plaintiff filed his application for disability insurance benefits and SSI benefits on September 15, 2009, alleging a disability onset date of August 1, 2005. The Commissioner denied his applications at the initial claim level, and Plaintiff appealed the denial to an ALJ. On October 28, 2010, the ALJ held a hearing, and on May 13, 2011, issued his decision holding Plaintiff was not disabled as defined in the Act. On May 16, 2012, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the Commissioner's final decision. Plaintiff has exhausted all of his administrative remedies and judicial review is now appropriate under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

**Standard of Review**

A federal court's review of the Commissioner of Social Security's decision to deny disability benefits is limited to determining whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind would find it sufficient to support the Commissioner's conclusion. *Id.* In making this assessment, the court considers evidence that detracts from the Commissioner's decision, as well as evidence that supports it. *Id.* The court may not reverse the Commissioner's decision as long as substantial evidence in the records supports this decision, even if substantial evidence in the record also supports a different result, or if the court might have decided the case differently were it the initial finder of fact. *Id.*

**Analysis**

In determining whether a claimant is disabled, that is, unable to engage in any substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than twelve months, 42 U.S.C. § 423(d), the Commissioner follows a five-step sequential evaluation process.[3] Plaintiff's primary argument is that the ALJ erred at step five by finding that an individual with his RFC could perform sedentary unskilled work. Plaintiff also argues the ALJ failed to give good reasons for discounting his treating physician's opinion and failed to properly analyze his credibility. The Court will consider these issues in the order raised in Plaintiff's brief.

**A. The Court cannot tell from the existing record whether substantial evidence supports the ALJ's finding that a substantial number of jobs exists that Plaintiff can perform.**

The ALJ based his determination that a significant number of jobs exists that Plaintiff could perform on testimony from the VE. During the administrative hearing, the ALJ posed three hypotheticals to the VE. The first hypothetical posited that the individual was left hand dominant and that the use of his thumb on his left hand was

> limited in that he can use the thumb to lift or carry only by a closure of the thumb to the forefinger or the flat of the hand . . . the thumb can be extended as far as would be normally possible,

---

[3] The five-step process is as follows: First, the Commissioner determines if the applicant is currently engaged in substantial gainful activity. If so, he is not disabled; if not, the inquiry continues. At step two the Commissioner determines if the applicant has a "severe medically determinable physical or mental impairment" or a combination of impairments. If so, and they meet the durational requirement of having lasted or being expected to last for a continuous 12-month period, the inquiry continues; if not, the applicant is considered not disabled. At step three the Commissioner considers whether the impairment is one of specific listing of impairments in Appendix 1 of 20 C.F.R. § 404.1520. If so, the applicant is considered disabled; if not, the inquiry continues. At step four the Commissioner considers if the applicant's residual functional capacity ("RFC") allows the applicant to perform past relevant work. If so, the applicant is not disabled; if not, the inquiry continues. At step five the Commissioner considers whether, in light of the applicant's age, education and work experience, the applicant can perform any other kind of work. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009). Through step four of the analysis the claimant bears the burden of showing that he is disabled. *King*, 564 F.3d at 979 n.2. After the analysis reaches step five, the burden shifts to the Commissioner to show that there are other jobs in the economy that the claimant can perform. *Id.*

> however [from the tip of the left thumb to the first joint down from it] . . . cannot be bent, say to hook something. But the hypothetical individual can close his hand to lift and carry. It does not affect handling, fingering, and feeling. Handling and fingering and feeling is frequent.

R. at 63-64. The VE initially responded that the individual would be able to work as a final assembler, patcher, or table worker. R. at 66. During follow-up questioning by Plaintiff's counsel, the VE clarified that all unskilled sedentary work requires "bilateral manual dexterity" on "at least a frequent basis." R. at 67. Upon further questioning, the VE observed,

> the use of opposable thumbs is what differentiates us from the other species, and the ability to perform the work required in sedentary unskilled work such as I identified would require the use of oppos[able] thumb[s]. *If there's no use of the left thumb, and that is in this case the dominant hand, I think that would preclude competitive employment*.

R. at 69-70 (emphasis added). Counsel and the VE then engaged in the following colloquy.

> Counsel: Now, when you - - you just used a phrase there, opposable thumbs. Would you describe the pincer motion that we discussed earlier as use of an opposable thumb?
>
> VE: It would, but I think it would require more than just the pincer motion in performing any sedentary unskilled work I would identify: Yes. You're talking about starting to bend the thumb now. My understanding is the thumb cannot be bent by the judge's hypothetical.
>
> Counsel: Okay. So earlier you said these jobs . . . required bilateral manual dexterity. Does that include the use of the thumb in an opposable way such as bending the thumb as we were just describing?
>
> VE: That's an interesting point, counselor. With the exception of the left-hand thumb which cannot be bent, any fingering and feeling were still frequent by the hypothetical.

4

> Counsel: I guess I'm asking you if within that hypothetical you think that those two limitations can exist simultaneously or if they're mutually exclusive?
>
> VE: It sounds like they're in conflict when you look at them that way.
>
> Counsel: So in your professional opinion, under the judge's initial hypothetical, frequent handling, fingering, and feeling is inconsistent with the inability to bend the left thumb?
> VE: [Especially] if it's the dominant hand.
>
> Counsel: Okay.
>
> VE: That's a very good point.

R. at 70-71. The ALJ then asked two follow-up questions of his own.

> ALJ: . . . Now with regard to the use of the thumb, I want to go back over it and make sure that we're clear on this because of your answers under counsel's questioning. *It's your professional opinion that if an individual can only use the thumb to perform a closure of the thumb anywhere against ha[n]d palm, against the flat of the hand, and can use that without limitation, and can close the hand against the flat of the hand* and to be specific, the thumb could go all the way to touch all four of the fingers, can reach in and move across the palm, *that that eliminates all work?*
>
> VE: If they're required to bend that first joint - - so are you saying without bending that first joint?
>
> ALJ: What I want you to do is I want you – and I don't mean to press the point, but I want you to - - I want to break this down. As I just described it, with the ability to go across the palm and to touch the fingers or even to - - and remember there's no limitations of the fingers. The fingers can come to the thumb. The thumb can remain, and the fingers can come to the thumb. And I thought that was implicit because I gave no limitation on how to - - on the handling, fingering, feel. Under those circumstances, could this individual do the three jobs that you previously identified?

5

> VE: *Judge, I think it's my professional opinion, especially [if] it's the dominant left hand, given the circumstances I don't think the individual could perform those jobs. I don't think there would be any sedentary unskilled work the individual would be able to perform.*

R. at 73-74 (emphasis added).

The ALJ then asked two other hypothetical questions. The second hypothetical was identical to the first except that the individual could use the thumb on his left hand frequently. R. at 75. The VE responded that such an individual could work as a final assembler, patcher, or table worker. R. at 75. The third hypothetical was also the same as in the first, except the ALJ assumed that after using his left thumb, the individual would have to reach over with his right hand and manually unhook the left thumb before he could use it again, but he could do this quickly. R. at 78. The VE answered that such an individual could work as a final assembler, patcher, or table worker. R. at 78.

In his decision, the ALJ made a long and detailed RFC determination. R. at 20-21. With respect to Plaintiff's left thumb, the ALJ found he "can use his thumb to lift or carry only by a closure of the thumb to the forefinger or the flat of the hand, *but the tip of the thumb cannot be bent to hook something*; he can frequently handle, finger, or feel . . ." R. at 21 (emphasis added). Plaintiff argues this RFC determination corresponds to the first hypothetical which the VE answered by stating the individual would not be able to perform any unskilled sedentary work. Consequently, he is entitled to an award of benefits.

The Commissioner does not dispute that the ALJ's RFC finding is identical to the first hypothetical, that is, it posits a left hand dominant individual who cannot bend his left thumb at the joint but can frequently handle, finger, and feel. Instead, the Commissioner suggests that "Plaintiff's argument incorrectly assumes that [Plaintiff] was incapable of frequent fingering and

feeling – a fact that is expressly contradicted by substantial medical evidence" (Doc. 14 at 15-16).  The Commissioner further argues that any error is irrelevant because Plaintiff had thumb surgery shortly after the administrative hearing, and a consultative examining orthopedic specialist, Dr. Charles Ash, M.D., predicted this surgery would "resolve" Plaintiff's thumb-related limitations within two months.  R. at 606, 609-10, 632.

Through step four of the sequential evaluation process the claimant bears the burden of showing that he is disabled.  *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009).  At step five, the burden shifts to the Commissioner to show that there are other jobs in the economy that the claimant can perform.  *Id.*

Given the existing record, the Court holds it cannot find that the Commissioner carried his burden at step five.  Although the record is somewhat unclear because the VE changed his mind and repeatedly qualified his answers, the VE arguably testified in response to the ALJ's first hypothetical that an individual with the limitations described in the ALJ's RFC determination could not perform any sedentary unskilled work.  On the other hand, it appears surgery performed shortly after the administrative hearing may have restored Plaintiff's ability to bend his left thumb and so his ability to work.  Thus, even if Plaintiff was unable to work for some period of time, this limitation may have been short-lived.

Unfortunately, the Court cannot tell from the existing record how long Plaintiff has been unable to bend his thumb, whether this impairment precluded all sedentary unskilled work, whether surgery successfully repaired this impairment, and if so, whether this impairment could have been repaired earlier had Plaintiff sought treatment for it.  Because all of these issues impact the disability determination, the Court holds this case must be remanded to the Commissioner for further proceedings.

**B.     The ALJ properly weighed Dr. Zolkowski's medical opinion.**

Plaintiff also argues the ALJ failed to appropriately weigh the opinion of one of his treating physicians, Dr. Greg Zolkowski, D.O.  Plaintiff argues the ALJ failed to provide a sufficient explanation for discounting the medical source statements completed by Dr. Zolkowski, and his medical source statements are consistent with the record as a whole.

The ALJ did not err in discounting Dr. Zolkowski's opinion.  Where, as here, the record contains differing medical opinions, it is the ALJ's responsibility to resolve conflicts among them.  *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008).  Although a treating physician's opinion concerning an applicant's functional limitations is generally entitled to substantial weight, "[a] treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole."  *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (internal quotation omitted).  The ALJ must assign controlling weight to a treating physician's opinion if that opinion is well-supported and consistent with other evidence in the record.  20 C.F.R § 404.1527(c)(2).  An ALJ cannot give controlling weight to the doctor's opinion if it is not supported by medically acceptable laboratory and diagnostic techniques or is inconsistent with the other substantial evidence of record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Halverson v. Astrue*, 600 F.3d 922, 929-30 (8th Cir. 2010).

If an ALJ discounts a treating physician's opinion, he must give "good reasons" for doing so.  *Dolph v. Barnhart*, 308 F.3d 876, 878-79 (8th Cir. 2002).  Once the ALJ has decided how much weight to give a medical opinion, the court's role is limited to reviewing whether substantial evidence supports this determination, not deciding whether the evidence supports the plaintiff's view of the evidence.  *See Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010).

The ALJ provided a number of good reasons for discounting Dr. Zolkowski's opinions.  As the ALJ noted, substantial record evidence contradicts the opinions expressed in Dr.

Zolkowski's medical source statements. R. at 23-26. Dr. Zolkowski's assertion that Plaintiff had "[n]o use of [his left arm and shoulder] at all" is inconsistent with the opinions of multiple other treatment providers. For example, Dr. Drew Shoemaker, M.D., noted Plaintiff's left shoulder caused difficulty with overhead activities, but Plaintiff walked normally and had otherwise normal motor function and full, painless range of motion in his left shoulder. R. at 354-55, 358, 361, 362-63, 438-39. Two treating orthopedic specialists, Dr. Nathan Milton, D.O., and Dr. Kenneth Smith, M.D., confirmed that with the exception of overhead motion, Plaintiff enjoyed normal muscle strength and range of motion in his left shoulder. R. at 374-76, 468. Additionally, another treating physician, Dr. Edwin Roeder, M.D., observed Plaintiff walked normally, had normal strength without pain in his left shoulder, and had only mildly reduced range of motion in his left shoulder. R. at 418-19, 620. Dr. Roeder specifically found Plaintiff's complaints of pain were inconsistent with his actual physical condition. R. at 419.

Additionally, an orthopedic surgeon, Dr. Ash, examined Plaintiff and found he had the functional capacity to lift ten pounds frequently and twenty pounds occasionally, sit for eight hours during an eight-hour workday, and walk and stand up to six hours during an eight-hour workday. R. at 604-07. This dramatically contradicts Dr. Zolkowski's opinion that Plaintiff could not lift any weight frequently and five pounds only occasionally, could sit for only thirty minutes continuously, and could stand and walk for only three hours during an eight-hour workday. Because the regulations generally give more weight to the opinion of a specialist rather than the opinion of a treating source who is not a specialist, the ALJ did not err in giving more weight to Dr. Ash's opinion. 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5); *Brown*, 611 F.3d at 953.

Finally, Dr. Zolkowski's opinions are occassionally inconsistent with Plaintiff's own reports of his symptoms. For example, Dr. Zolkowsk's mental medical source statement asserts

9

that Plaintiff is extremely limited in his ability to concentrate, perform activities within a schedule, and sustain an ordinary routine, and that these limitations preclude *all* useful functioning. R. at 403-04. But Plaintiff denied having psychiatric problems on multiple occasions. R. at 318, 323, 327, 336, 341, 368, 374, 468, 513, 518, 531, 538, 551, 619. He also told Dr. Forsyth that his mental impairments were "not that serious" and controlled by medication. R. at 585. After performing significant psychological testing, Dr. Forsyth agreed with the Plaintiff, concluding he had the capacity to understand, remember, sustain concentration, and adapt to workplace changes sufficiently to perform at least simple tasks. R. at 586, 588.

Consequently, the Court holds the ALJ did not err in discounting Dr. Zolkowski's medical source statements. R. at 23-26.

## C. The ALJ properly analyzed Plaintiff's credibility.

Finally, Plaintiff argues the ALJ mischaracterized the evidence in conducting his credibility analysis. As a threshold matter, credibility questions concerning a Plaintiff's subjective testimony are "primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003). Here, consistent with 20 C.F.R. § 416.929 and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1983), the ALJ gave good reasons for not crediting Plaintiff's testimony.

First, substantial evidence supports the ALJ's conclusion that Plaintiff appeared to be exaggerating his symptoms and engaging in drug-seeking behavior. R. at 22-23. Dr. Forsyth observed Plaintiff demonstrated "poor" and "uneven" effort during his mental status examination and "would not even try on some things or at least would give up easily." R. at 584-86. A second psychologist, Dr. Annie Anderson, Psy.D., noted during two mental status examinations that Plaintiff "would not attempt" questions in a way that "greatly impacted" the results. R. at

473, 478. Additionally, Dr. Roeder opined that Plaintiff's reported pain and symptoms were inconsistent with his actual physical condition and opined "there [we]re some narcotic issues involved. R. at 419. These are good reasons for an ALJ to discredit a claimant's subjective complaints. *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).

Second, the ALJ properly discounted Plaintiff's subjective complaints based on his sporadic work history. R. at 23. It is well-settled that a poor work history "may indicate a lack of motivation to work rather than a lack of ability." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). During the fifteen years prior to the onset of his alleged disability, Plaintiff earned less $5,000 in income in five different years and less than $10,000 in ten different years. He also appears to have worked for at least eight employers. R. at 158, 192, 224.

Finally, the ALJ noted Plaintiff performed significant activities of daily living during the relevant period. R. at 19, 22. Plaintiff prepared meals daily, performed household chores, washed laundry and dishes, cared for his dogs and 20-year-old son, sat on his porch, shopped for groceries two hours at a time, and watched television. R. at 56, 58, 212-15, 585. Plaintiff also had no difficulties with personal care. R. at 212-13. These activities are inconsistent with Plaintiff's self-reported allegations of disabling impairments. *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009). Furthermore, after reviewing the record, Dr. Charles Bowles, Ph.D., opined Plaintiff had no significant deficits in his ability to perform activities of daily living. R. at 385.

Because substantial evidence in the record as a whole supports the above findings, the Court affirms the ALJ's credibility determination. *Halverson v. Astrue*, 600 F.3d at 932-33).

## Conclusion

For the reasons discussed above, the Court REMANDS this case to the Commissioner for further proceedings consistent with section A of this decision.

**IT IS SO ORDERED.**

Date:   September 25, 2013            /s/ Greg Kays
                                      GREG KAYS, JUDGE
                                      UNITED STATES DISTRICT COURT